# SUPREME JUDICIAL COURT

FOR THE

COUNTY OF MIDDLESEX, OCTOBER TERM 1852, AT
CAMBRIDGE.

PRESENT:

Hon. LEMUEL SHAW, Chief Justice.
Hon. THERON METCALF,          ⎫
Hon. GEORGE T. BIGELOW, ⎬ Justices.
Hon. CALEB CUSHING,          ⎭

HIRAM CUMMINGS & others *vs.* AUGUSTUS L. BARRETT &
others.

An owner of a mill on a watercourse cannot maintain a bill in equity to restrain
a riparian proprietor above from cutting ice in his pond on the same stream,
until the rights of the parties have been determined at law.

SHAW, C. J.    This is a bill in equity, and a general demurrer.    The complainants bring their bill on the equity side of this court, under the head of nuisance, and seek to obtain an immediate, and ultimately a perpetual, injunction upon the respondents, to deter them from a disturbance of their right as owners and occupiers of mills and mill privileges.

They set forth their interest as tenants for years of a tract of land described, with mills and mill privileges thereon, partly in their own occupation, and partly occupied by their tenants at will; and they set forth their rights in and to the pond, and water of the pond, called Smith's pond, and all the water flowing out of the same, and by and along their said mills; said pond lying partly in Stoneham, and partly in South Reading, and containing one hundred acres. They aver that there is no other outlet to said pond, but the stream on which their mills are situated; that they have the exclusive right to regulate and control, by dams and gates, all the waters in and flowing from said pond, and the full and sole right to take and use all the water flowing from said pond, including all the water discharged therefrom, and also the right to enter on said pond. And finally they aver that the water flowing from said pond, is often, and particularly in dry seasons, not sufficient to carry their said mills, or any one of them.

The disturbance complained of is, that the respondents, knowing the complainants' title to all the waters flowing from Smith's pond, on the 5th day of February, 1847, and on divers other days and times, did take and carry away said waters in the form of ice, to a great amount, viz: 5,000 tons, to be carried away and sold as merchandise; that they have built icehouses on the margin of said pond, and threaten to take and carry away more ice in succeeding winters, as a permanent business.

In one aspect of this bill, it might be properly held that the complainants have stated no disturbance of their right. They allege that they have a right to all the water flowing out of Smith's pond, for the use of their mills. But this is not inconsistent with a right in the proprietors of land adjacent to the pond, to take water for domestic use, for farming or manufacturing purposes, as distilling or brewing, requiring the consumption of water, or for irrigating lands, and also for ice for themselves and their neighborhood, and for exportation. Such water taken from the body of the pond, before it ever could reach the outlet, never could be water flowing from the pond, by or to the complainants' mills.

But the complainants insist that their bill was intended to have a wider scope, and they insist that they have a right, in virtue of their ownership of the mills and mill privileges described, to have all the water collected by natural causes in Smith's pond flow to their mills, and that any abstraction of the waters which would otherwise flow from that pond to their mills is a violation of their right.

This is a case of first impression, and though apparently of no great importance to these complainants, as mere tenants for years for a short term, yet as between owners in fee of mills and mill privileges, and the lands on which they stand, on the one side, and owners of land adjacent to the ponds which supply water to such mills on the other, it may be of great importance now, and in progress of time may become much more so.

By the Colony Ordinance of 1641, Ancient Charters, 148, 149, all great ponds, which are defined to be ponds of over ten acres, are declared public; and though lying within any town, shall not be appropriated to any particular person or persons. We are not aware that this ancient law has ever been altered. What the rights are of adjacent or riparian owners of land bordering on such ponds, has, we believe, never been the subject of adjudication or discussion. Some rights, we suppose, have always been exercised by such proprietors, such as a reasonable use of the water, for domestic purposes, and for watering cattle. But in the advanced state of agriculture, manufactures, and commerce, and with the increased value of land and all its incidents, there will probably be hereafter increased importance to the question, whether and to what extent such riparian proprietors have a right to the use of the waters, for irrigating land, for steam-engines, for manufactories which require a large consumption of water, and for the supply of their own icehouses, for delivery to neighbors, and for more distant traffic.

In a case between the owners of a mill with the privilege of a mill stream, and the riparian owner of land, on a large pond, supplying such mill stream, the nearest analogy perhaps, and that is apparently a strong one, is to that of riparian proprie-

tors, on a running stream.    As between these, we think it is
now well settled that the upper proprietor has a right to make
any use of the stream which is beneficial to his estate and
himself, which is reasonable, and does not either wholly take
away the right of the lower proprietor, or does not practically
and in a perceptible and substantial degree diminish and
impair the equal and common right of the lower proprietor.
Whether the acts of the upper proprietor do in a particular
case substantially and perceptibly diminish the value of the
stream to the proprietor below, and so, whether it is reasonable,
may often be a question of fact, depending on the peculiar
circumstances of the case.    *Elliot* v. *Fitchburg Railroad Com-
pany, post,* 191.

We should hesitate to decide in a case like this, that a mill
owner on the outlet of such a pond, can deprive any person
of the right of cutting and carrying away ice, without show-
ing actual damage to himself by diminishing the quantity of
water to such a degree as to cause an actual, perceptible, and
substantial damage to the use of the mill.    The complainants
in their argument, do not claim that they have suffered much
damage in this way ; but they intimate that if the ice of this
pond is to be cut up and sold at two dollars per ton, they
desire to obtain their share of the profit.    But a question, and
in fact, the main question, lies behind this, that is, whether
they have any such right as mill owners, as warrants them to
claim any such participation in this profit.    And it appears
to us that this is a new, and at present unsettled right, and
not fit to be tried in a suit in equity, until it has been tried
and determined at law; especially in a suit like the present,
brought by tenants for years, for a short term, whose term
would be likely to expire before the suit could be brought to
a close ; and it is quite doubtful whether any decree in this
suit would be conclusive of the right, as between the owners
in fee of the mills and these respondents.

But there are other considerations.    It is quite doubtful,
considering the complainants' claim as a claim for actual and
substantial damage done to their mills, whether the cutting
and carrying away of the ice mentioned, or of any quantity

of ice, would diminish the volume of water which would come to the complainants' mills, and of which they could avail themselves for driving their mills. Ice must be cut in winter. It usually melts in the latter part of winter, or early part of spring, together with the ice and snows of the surrounding country, and these, together with the rains which cause and promote them, constitute what is usually called the spring floods, which commonly cause a great surplus of water in similar mill streams, not only not available to any useful purpose, to mills, but often injurious.

And it may well be doubted after any quantity of ice cut from such a pond, whether after the spring floods have subsided, and the useless surplus of water passed away, and long before the approach of any " dry season," the water in the pond would not be as full and copious for all mill purposes as if no ice had been so cut. But whether so or not, it would involve a very nice question of fact, to be tried under all the advantages which the testimony of science and experience could afford in a suit at law, where the right depending both on the fact and the law, would be directly in issue.

Again; the powers of a court of equity are not to be called into exercise to consider matters of trifling amount, or to recover nominal damages. The rule *de minimis* is applied in equity with reasonable strictness. In New York, the rule is that a suit in equity will not be maintained, when the amount is less than one hundred dollars. That, however, is we believe, fixed by statute. No such statute exists here, but a similar principle is applied. Now taking the statement in the bill, the respondents are alleged to have taken away 5,000 tons of ice from a pond of one hundred acres in area. Taking these conjectural estimates to be true, we presume this might amount to only a small fraction of an inch of water in depth, an amount which we presume might be carried off by evaporation, in a dry windy day in February or March, and which, if concentrated and preserved, might have driven the mills of the complainants an hour or a few hours.

But the strong and conclusive reason is, that we think a bill ought not to be maintained in equity, unless to prevent irrep-

arable damage, or to afford a more ample remedy, when the right has been adjudicated, or is uncontested, until the question has been settled at law, especially where the obvious object is to enforce a new claim, and where the right can be easily tried in a court of law. Suits are often sustained in a court of law, wherein nothing but nominal damages are claimed, when the object is to adjudicate and settle a right, and when such judgment will be binding and conclusive upon the parties, and upon all persons interested in the estate. If the complainants have the right they claim, to all the water in Smith's pond, and if the cutting and removal of ice therefrom by the respondents is an infringement of that right, these would seem to be facts easily proved, and not requiring any discovery from the respondents, and none of the peculiar remedies and means of redress which a court of equity alone can afford. If they have sustained any damage for which they can be compensated by a verdict for money, and even if they have sustained no perceptible damage, but their absolute right has been infringed, they can have such right adjudged on a verdict for nominal damages.

*Bill dismissed.*

*S. E. Sewall*, for the complainants.
*H. H. Fuller*, for the respondents.